23-17-27 National Labor Relations Board v. Starbucks Corporation. Oral argument not to exceed 15 minutes per side. Ms. Harris for the respondent. Thank you and may it please the court. Sarah Harris for Starbucks and I'd like to reserve three minutes for rebuttal. This court should vacate the board's order for two reasons. First, the order flunks substantial evidence. Whitbeck was a shift supervisor who violated an important safety rule by abandoning her colleague at night in a store where customers had been violent and failed to alert her manager to solve the problem. The board doesn't dispute the rule violation or that serious discipline is warranted. The board just says animus explains termination versus a final written warning. But the board's inferences are logical and sidestep Starbucks case-by-case disciplinary policy and even handed termination of BG, an anti-union shift supervisor, for his role. And second, the board's remedy of all direct or foreseeable losses to employees exceeds the board's statutory authority. The NLRA authorizes only equitable relief, not compensatory damages. The board remarkably claims the power to grant any relief, legal or equitable, that the board thinks serves the policies of the act. That reading drains the statutory phrase affirmative action of meaning and raises serious Seventh Amendment concerns that Starbucks reading avoids. Now, starting first with the substantial evidence issues. I see a question about that. So I do have some concerns about some of the justifications put forward by the board. The one that seemed most problematic to me for your side is sort of the uneven discipline that the people who violate this rule, two employees have to be in the store, that either there's not much history of that being enforced or it's been enforced in different ways. Can you can you address that point? Yes, and I think there's a legal error in the board's analysis that's best illustrated by the DC Circuit's Stern produce decision. The legal rule is where as here the employer, here Starbucks, has a case-by-case disciplinary policy. The partner manual says corrective action is case-by-case. There's no one, you know, no one discipline that is necessary. The board cannot turn around and point to one or two instances of less severe discipline and assume that a more severe instance of discipline necessarily reflects animus. So that's the problem. That's a consideration, isn't it? Don't they get to place that in the evidence and isn't the question then whether there was substantial evidence that supported the decision? Respectfully, not if you followed the DC Circuit's approach and avoided a circuit split. The DC Circuit is saying it's not probative of animus if the employer, as here, holds itself out as having a case-by-case discipline policy. The board's burden in that situation would not just be to point to one sort of different situation or in Stern produce two different situations where someone got less discipline. It would be to show there is a de facto policy or pattern of practice of actually only doing lesser discipline. And so that animus... So what does it take to get a pattern or practice? So you say one or two, what does it take to show that there is a pattern if they do things differently? Again, I think that's the board's burden and we don't, it would certainly be more than one or two. I think it would be evidence that there was a more uniform practice. They could have called other witnesses who said as a practical matter, when Starbucks does this, it really only does final work, but it's not a practical matter. They could have issued other warnings. They could have induced other evidence. That's really a question for the board. What we know from Stern produce is that case is a lot that had two exemplars of people who got less discipline. And the DC Circuit still held, when there is a case by case policy, you can't really infer much about that. And here, again, I think it would be especially strange to infer a lot because Whitbeck had an aggravated violation in this situation. And I think it shows why the case by case policy is what it is. The termination notice was not just you violated, concededly violated, the two employee rule. It was you also failed to communicate with a store manager, the person who is able to avoid the situation. No one is saying Whitbeck had to be at the store at 7 o'clock, no matter what. The issue was, had Whitbeck called her store manager, which again at JA 160 to 161 in testimony that ALJ credited, she could have done at least 30 minutes of communication. Manager Lind had multiple options for avoiding the problem of someone being abandoned at a store where customers have been violent two or three times a week. The manager could have called people who were five or ten minutes away walking distance to get coverage. The ALJ actually finds this at JA 13. So this is all testimony that is credited. And so Lind says, if you call me, you know, you could have done this stuff. I could have also just had you close the store. You could have left. You don't have an employee left behind if there's no one there. Just leave. Was the comparator also having other aggravated circumstances? Not ones that were this. Well, yeah, not ones that were this. They were actually a case where the employee laid his hands on someone. But again... Now is that not an aggravating circumstance? Again, if you take the position that... I still think it's apples and oranges of a situation where there's an employee who concedes that she could have avoided the situation with communication. And if you go on this sort of one-to-one comparator approach, you're locking employers into the idea that even though they have a flexible disciplinary policy where they consider things case-by-case, they are actually bound to whatever the least discipline is for any employee anywhere. And that's very problematic, especially, again, would be a split with the D.C. Circuit. But just to take a step back, again, we're talking about a totality of the circumstances test. So even if you don't credit, even if you credited the board on one of these, all we have to win is at least like one of the considerations was legally erroneous. And then the proper course under the Supreme Court's CalCut decision is vacater so that the board has to reconsider would it still find animus in a world where it can't consider some of the factors. And so the comparators, I think, have a legal error that is very problematic for the board, but that's obviously not the only error that we think infected the board's analysis here. The sip-in is another example of a situation where there's a legal error. The board is saying that because District Manager Schmell attended a sip-in at a different store where Whitbeck wasn't present, that alone can be enough to impute animus to Whitbeck. And again, the legal error there is this court said in Five Cap, the D.C. Circuit said in Mapleton, the Eighth and Eleventh Circuits have similar cases, all of which say you can't just assume from a separate incident somewhere else or even from generalized statements that an employer necessarily has anti-union animus as to a specific person. There has to be a nexus. The board didn't show that here. That is a legal error that in of itself would also warrant vacater. So again, I think there's just a bunch of different ways of going through the four things the board threw out there that are not appropriate inferences. Just quickly turning to the remedial question. It may not be quick.  A lot of the briefing in this case on this issue sort of came in by the 20HA letters. So some interesting questions, I think, for us. But what in your mind is the current status of Atlas Roofing? Because I think your friend on the other side is going to say that there's no Seventh Amendment problem here because it's a public right. The board can adjudicate this kind of thing without having to worry about the constitutional jury trial backdrop. The current state of Atlas Roofing, per the Supreme Court's Jarchese decision, which issued after briefing closed, is Atlas Roofing is best case scenario on life support and its status is highly dubious. And just more broadly with respect to the board's public rights argument, the board in its briefing and in its Thrive decision take the position it doesn't matter even though the remedy may, quote, somewhat resemble compensation for private injury, that's okay because the rights here come from a statute. That has not been the law since at least Toll in 1987, Grand Financiera in 1989. The Supreme Court reputed that position a really long time ago. Jarchese did not break new ground in saying that just because an agency is enforcing a statutory right does not mean it's a Seventh Amendment free zone. And again, I think the board's position is a real problem because under their theory if you're home free, if you invoke a statutory right, I don't know how they explain the Supreme Court's holding in Jarchese because the SEC too was trying to enforce a statutory right against securities fraud. If the penalties don't matter, if it doesn't matter if it's sort of legal or equitable, I think that's a real problem for them. And again, the other thing that Jarchese does is reinforces the line that we are drawing here and shows the real constitutional avoidance problems with the board's approach. Our view is affirmative action in the NLRA, just like affirmative action under Title VII, a statute the Supreme Court has said should be interpreted in tandem, means equitable relief. It does not mean legal relief. And the Supreme Court in Jarchese just said the quintessential form of legal relief is money damages, citing Merton's and Arisa case that draws the same line. Why isn't it recognized in equity that make-whole remedies may include monetary remedies because they are make-whole remedies, which is in fact since the beginning of the division between law and equity, an equitable remedy? So no, the line in equity and the line that we are drawing here and the same line that the Supreme Court draws in the Seventh Amendment context and other contexts is there can be some equitable money relief. But that relief is equitable only if it is disgorging the gains that the defendant improperly gained from wrongful conduct. It's essentially restitution. That's what the Supreme Court says in Jarchese again. If you have a make-whole situation... The distinction in Jarchese was a punitive damages award, right? Respectfully, Jarchese, yes, involves civil penalties and says if it's punitive, that's obviously a tell-tale sign. But the part of Jarchese before that says, citing Merton's, if it's compensatory damages are a classic form of legal relief. And in equity in the traditional case law, the distinction is defendant's wrongful gain being disgorged. That's equity versus compensating the plaintiff for their losses. That's classic money relief. The Supreme Court drew that same line in Burke and the Title VII context to hold, again, with materially similar statutes. Title VII is really a different matter. This was an amendment to Title VII that initiated those kinds of remedies. What you have in the NLRA is a consistent thread of remedies throughout. I was concerned with the briefing idea that there was a suggestion that this was wholly new, when, in fact, the case law shows that the Board has been giving that type of make-whole remedy since the 1940s. So, respectfully, what the Board has been doing since the 1940s is simply back pay, which we have no quarrel with. We don't have quarrel with the idea that... Is your position to this Court that there is no precedent regarding the NLRA that shows that there have been make-whole remedies since early on in the statutory life? No. What we're saying is the make-whole remedies are back pay and other affirmative action that tracks equity. And I would point you to Virginia Electric, which is a good example of something. We are not taking the position it's back pay or nothing. That's sort of a strawman position. We are saying it's affirmative action. Things recognize equity. That can include certain types of monetary relief. But in Virginia Electric, I think this is really important. The Supreme Court says there the employer can be forced to disgorge union dues that improperly forced employees to pay in an employer-created union. And the reason was the Supreme Court said it was important to, quote, deprive the employer of the advantages accruing from a particular method of subverting the Act. In other words, take away from the employer, the wrongdoer, in a restitutionary way, what the employer had improperly gained. That is very different, and I think why the Fifth Circuit in the Thrive decision itself referred to what the Board is doing here as novel compensatory damages like remedies. Ordering someone to pay all direct or foreseeable losses that a plaintiff suffers is the very definition of compensatory damages. It's a different purpose. It's not disgorging. And if you are incorrect on the support in the law for the public rights exception, then that argument fails. Is that correct? The only argument that would fail potentially would be the Seventh Amendment constitutional avoidance argument, not our statutory argument. Our statutory argument stands alone. The Seventh Amendment is another thumb on the scale. Our statutory argument is the word affirmative action is and always has referred to equity. You know that both from the text of that statute, the related text of Title VII, and Supreme Court cases interpreting it, and the Supreme Court's decision in Russell where the Supreme Court said of the NLRA that it does not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct. So I think whatever way you slice or dice it, there's a lot of statutory indicia don't even require you to get into the Seventh Amendment constitutional avoidance issue that are real problems for the Board in this case. Again, I think Jercasey makes— Thank you. Oh, did you have a question? I was just going to—I mean, can you help me kind of understand the backdrop here? Because this statute's been around for 90 years. And maybe there's some breadcrumbs here or there over that 90-year period that you can do something outside of sort of like core equitable remedies. But it's not until 2022 that we get this decision that sort of like lays this all out, that it's been the law for the last 90 years when you kind of have to look under rocks to find this is true. I mean, is that your impression of the sort of backdrop of NLRB decisions and Supreme Court precedent, or has Thrive just—what's always been the case and just for some reason in 2022 the Board decided to put pen to paper on it? Our position is absolutely—we agree with the Fifth Circuit. It is a novel remedy. It is not what the Board has previously been doing. They never previously had a categorical rule, and this rule goes well beyond the ad hoc remedies that they had tried to do before then. Thank you. Good morning. May it please the Court. Eric Weitz on behalf of the National Labor Relations Board. Since it was just being discussed, I'll start with the remedy and, of course, discretion. So I'll just start by noting that Starbucks here is making two incredibly expansive arguments. Number one, a reinterpretation of Section 10C of the Act and the term affirmative action. And number two, a categorical constitutional argument that the Board can never award any form of MACOR relief beyond back pay or some form of employment-related discouragement. I'll just note—I don't want to belabor the point, but those arguments were not raised to the Board. I would just point the Court to Supplemental Appendix 31 to 35, which is where— Does the Metro Man case speak to this point? It does not, Your Honor. Metro Man was a case where this Court found in the two footnotes to that opinion that the employer had, in fact, raised the specific argument, which was a factual argument. In that case, that was in question. So there was basically a factual dispute with the Board as to whether it had been sufficiently raised. Now, obviously, there could be a dispute here, too, so I would just rest on this Court reading what Starbucks actually argued to the Board. And nowhere in those arguments did Starbucks make this radically new argument, which in the last 90 years of the Act, no court has ever evaluated the Board's remedial authority based on an equitable versus legal distinction, and no court has ever suggested that the Seventh Amendment bars any form of monetary relief other than back pay and related MACOR relief. What do you say they are arguing in those pages of the Supplemental Appendix? So primarily they were adopting, by reference to the dissent in Thrive, the two Board members dissented in Thrive. Those two Board members fully agreed that the Board can award direct and foreseeable pecuniary harms. They disagreed with the level of causation required, which is not an argument Starbucks is making. That's how the Seventh Amendment was invoked in the dissent. And beyond that, in the briefing to the Board, Starbucks took the sort of textual position that the language of 10C means that back pay is the only form of, quote, damages, that's the term they use to the Board, that the Board is entitled to award. And as the Board noted in its brief, that was resolved by the Supreme Court long ago in Phelps-Dodds and Virginia Electric. So again, I'm just noting this as a preliminary matter. I think it would be most beneficial for the Court to just see what they were actually arguing and if the Board was on notice at all that it needed to respond to this very significant and radical attempt to reinterpret the Act. But moving on to the... Well, I mean, that begs the question, who's dramatically and radically reinterpreting the Act? So we've had 90 years, and we all agree on the math, we've had 90 years of a scheme that, until Thrive, what are the best cases that say that this Thrive rule was clearly demonstrated prior to 2022? It just feels like a major... I think we can all agree it was a departure, and we can figure out whether it's consistent with the statute, consistent with the 7th Amendment. Absolutely, Your Honor. It is a major change because the Board is now saying in every case as part of its standard remedy it's going to include a particular form of relief that it has included historically on an ad hoc, more intermittent basis. So I'd note in responding to your question, Judge Rather, that Starbucks here is making basically a facial challenge and saying that in no situation can the Board order this type of MECO relief, and that is simply contradicted by many cases throughout history. One good example I'd point the Court to is the Supreme Court in the case Bill Johnson's Restaurants v. NLRB, which was a case where the Court was evaluating retaliatory lawsuits when an employer brings a lawsuit against an employee with a retaliatory motive and it's baseless, that's an unfair labor practice. And the Supreme Court, as the lower courts have also agreed, affirmed in that case that the Board can require the employer to make the employee whole for legal expenses incurred defending against that lawsuit. That's a type of MECO relief that has nothing to do with the employment relationship. It is not disgorgement or whatever clarification that Starbucks is attempting to draw in its reply brief. That's just one example. We also cite a number in our brief such as damaged property, where an unfair labor practice caused an employee's personal property to be damaged. That is, again, MECO relief that has nothing to do with the employment relationship. And I'd also just note that Starbucks' position is not even entirely clear. They've taken the position in their reply brief and now an argument that the dividing line is whether something is restitutionary, meaning it's the disgorgement of an unlawful gain for the employer. Back pay itself, the quintessential MECO remedy under the Act, is not disgorgement. That is, you could characterize that as a form of damages for the lost wages that the employee did not receive. It is not an unlawful gain for the employer. Typically, the employer has hired another employee and been paying them for the same work and is essentially just out of pocket for additional back wages. So whatever distinction Starbucks is trying to draw, they have not even presented a meaningful distinction between what the board did in Thrive and just basic back pay, which is in the statute and obviously is very— You put any limits on the board's power to remedy wrongs? Absolutely, Your Honor. The scope of the board's remedial authority is well-defined, and in some sense it is very broad, as Congress intended. So it is the board is directed to order affirmative action that will effectuate the policies of the Act. But there are significant limits on that, as the Supreme Court and lower courts have recognized, because the policies of the Act are so well-defined. So throughout the last 90 years, the Supreme Court and lower courts, on many occasions, have found that the board has exceeded that authority. I would note one illustrative example, the Shertan case that we cite in our brief. That was a case where the Supreme Court was reversing— I believe the Ninth Circuit had imposed a remedy, a make-all remedy, for undocumented workers because those workers can't be reinstated. In fact, they often have left the country and can't return to the country. And the Ninth Circuit had imposed a sort of standardized make-all remedy. And the Supreme Court reversed that because that exceeded the policies of the Act because it did not involve the sort of particularized inquiry. It was similar to a fine. But I would note that in reversing that remedy, the Supreme Court made no suggestion that there was an equitable limitation in the actual text of the Act. So their friends on our side gave some examples. Things like—just reading from their brief—missed mortgage payments, credit card late fees, child care expenses, all things that could be tied to you're out of work and there's these consequences that follow. Are those in? Are those out? Case by case? It's case by case, Your Honor. So I'd note that in this case, no harms have been alleged. In fact, there's even a question whether there would be any because there was an interim injunction here. So Miss Whitaker actually was returned to the workplace. So no harms are at issue at this point in the proceeding. But as a general matter, the Board did note as potential examples, but it's important to remember that what the Thrive remedy is doing is setting very strict evidentiary standards that the Board's general counsel would need to prove in compliance. So there would need to be proof that there was a concrete pecuniary harm. The Board's not addressing intangible harms, emotional distress, etc. Concrete is direct and foreseeable. Right. So it needs to be a concrete pecuniary harm. There needs to be proof that it was either directly caused by the unfair labor practice or was foreseeable and resulted as a result of the unfair labor practice. So there's a causation element. And then there's the question of amount. And the Board's general counsel has the burden of proof on all three of those points. An employer in a given case will have a full opportunity to rebut any of that and dispute whether something was actually caused by an unfair labor practice. So that is the framework the Board's adopting. In a particular case, those type of examples could hypothetically arise. Is your argument that these are all essentially equitable remedies at heart or that the Board's power through the NLRA goes beyond sort of core equitable? Well, it's sort of our secondary argument that these are, in fact, this is, in fact, equitable relief because it's maker relief. And more importantly, it's incidental to reinstatement. The thrust of the Board's remedies are to restore the status quo ante, return the employee. So your top line argument is that the Board has broader power than just equitable. Yes. The top line argument, well, I guess there's two, Your Honor. Two top line arguments plus a secondary. I apologize for the confusion, but Starbucks is making two separate but related arguments. So they're making a statutory argument based on this equitable versus legal distinction, saying the statute itself contemplates that. So presumably in any case, that is the test now for the Board's remedies. We're disputing that the statute sets any bounds. Our position is that the Supreme Court has already established what Section 10c says. Does that run into a jarczy problem? Well, so that's the other related issue is that they're also making a constitutional argument that the Seventh Amendment prohibits this. And our primary answer to that is that it's established in binding Supreme Court precedent that the Supreme Court has no application, that's quoting the Supreme Court, to the Board's proceedings. And I'd respond to a point that my opponent made mischaracterizing our position. Our position is not that these are public rights or the Supreme Court's position. It's not that these are public rights because they're derived from a statute. I may have asked a question about this, so maybe I prompted it. Sure. Go ahead. But our position is not that these are public rights because they're in a statute. It's because the entire scheme is unknown to the common law and is addressing something that is not a private rights adjudication. So I'd point the court to Curtis v. Lothar, the Supreme Court's decision where the Supreme Court drew that distinction, noting that statutory rights can still be covered by the Seventh Amendment. In doing so, in that foundational case, they actually distinguished Jones and Laughlin and the NLRA as an example of a statutory scheme that was a public right. But we now have JARCISI. They have this line about novel statutory regimes. So you don't think that encompasses the NLRA? Well, I think, number one, JARCISI did not purport to be overruling any precedent. The court doesn't seem to overrule anything anymore. They just sort of put cases in a corner. Fair enough, Your Honor. But I would note that whatever the implication of JARCISI in other contexts, the Supreme Court actually cited and quoted approvingly Jones and Laughlin, which is the foundational case involving the NLRA, as an example of a public rights adjudication. So there's certainly no implication that has been overruled. There's obviously the Agostini principle that lower courts are not supposed to infer that the Supreme Court has overruled its own precedent by implication. So there's no statement by the Supreme Court calling Jones and Laughlin into question, nor, I would note, Atlas Roofing, because we're not citing Atlas Roofing for the portion that the Supreme Court perhaps called into question in JARCISI, which was a very broad formulation of public rights. We're citing Atlas Roofing specifically for its discussion of what Jones and Laughlin had already held. So that's what we're relying on Atlas Roofing for, is that it's clarifying and explaining that there were two separate holdings in Jones and Laughlin, which is a foundational case in administrative law, and the plain holding of the Supreme Court is that the board adjudicates public rights, and that does not require an individualized case-by-case inquiry into the remedy. It's simply you're outside of the bounds of Article III altogether. And I would note, again, in terms of JARCISI, to the extent Starbucks is implying that the public rights exception no longer exists or is limited to a tiny handful of categories, I think it would be questionable if the Supreme Court intended that, because that would have drastic implications for the administrative state writ large, both in terms of the Seventh Amendment and Article III. And so I think the most reasonable reading in this case, all that the court needs to say in this case, is that JARCISI cited Jones and Laughlin. It did not disapprove of it. That is still binding precedent. And this court, as a lower court, can leave it to the Supreme Court to clarify if it wants to take a different position. But for the time being, the public rights exception is still applicable to the board's proceedings, and that's a categorical way of resolving the Seventh Amendment, even assuming it had been properly raised and was properly before the court. I see I'm running short on time, so if there's no further question on the remedy, I can get to the unfair labor practice quickly. There was some discussion of the disparate treatment. Well, actually, first of all, I would make a meta point that Starbucks has taken the position that if any one of these four factors the court disagrees with, that vacature is warranted. That's not the case. To explain that, it's important to look at the framework the board is applying here, which is the well-established right-line framework. And under that framework, approved by the Supreme Court in transportation management, when an employee has engaged in protected activity, the employer is aware of that activity, and there is some evidence of animus. It's not a high threshold. As a framework, the board will infer that an unlawful motive contributed, and that's why you then have a burden shifting, and the employer has an opportunity to nonetheless present a defense. So as long as there's any evidence of animus, that's sufficient under right-line. So if any one of these four considerations. Which is the best of the four? Because I don't think they're all equal. Sure. What's the best of the four in your mind? I think the strongest by far, well, there's two very strong ones. You have to pick among your children, I understand. Right. To me, the strongest is disparate treatment, because, number one, Stern Produce did not establish a rule that you disregard disparate treatment until you have a certain number of examples. Stern Produce was a fact-specific case where you had three examples of discipline that were all based on violations of a new anti-harassment policy that had just been promulgated. And it was very subjective as to, you know, what level of harassment this rose to. And the D.C. Circuit in Stern Produce was simply saying, just because the employer decided that one example was slightly less, that's not disparate treatment by itself. Would you agree this is a terminable offense? Just looking at the offense itself, would you agree that it was appropriate for Starbucks to terminate someone for violating the policy? Well, I don't have an opinion on whether it would be appropriate. I would note that under right line, once you get to the burden, the employer can't just say, oh, that we could have terminated. I mean, obviously, employees are generally terminable at will, so any misconduct could be terminable. They have the burden. You're asking us to infer animus because other people in slightly different situations weren't terminated and maybe there wasn't a unionizing issue there. I mean, it's a little bit hard. These aren't apples to apples. I think the distinction, and I would push back against that, Your Honor, because I think they are apples to apples, and that's another distinction of termed produce. Here, you don't have a subjective evaluation of some form of harassment. You have a bright line rule that employees are not supposed to be to leave a coworker in the store by themselves. In the comparator example, which I would note, there's only one example because Starbucks only produced one example. They were subpoenaed for any examples of this rule being violated in any of these Michigan stores. They could only produce one example over the last several years. They had an opportunity to present examples from other stores or other time periods and didn't. So the only example we have at this very store was an employee. If you look at the facts, I'd point the court to Joint Appendix 263 to 264 and 268 to 269. The other example was an employee who was doing the same thing, even worse. In fact, on multiple occasions, he had left the store without telling anyone, had left a junior partner in the store alone, and there were also aggravating circumstances, as Judge Stranch noted, where he had actually also assaulted a coworker. In that situation, he was not discharged. So the notion that there were supposedly aggravating circumstances here because Ms. Whitaker didn't call someone in advance, that's duplicative of the violation itself. In none of these situations, if someone's leaving the store when they're not supposed to, are they arranging for backup? So that's just an aspect of the violation. We don't dispute that it was improper and was a misconduct, if that answers your question. But the fact that the only other example and the job aid, which I'd also add, which suggests that these violations, it's not binding, but there's actually written guidance that there should be a final warning, that's the only evidence on the record. The fact that this was completely different and they don't really explain why, I think is very strong evidence of disparate treatment, and so I would say that's the strongest, although I think a close second is the total lack of investigation in this case. There again are written policies that Starbucks performs a certain kind of investigation, takes into account attenuating circumstances, and contrary to what Starbucks suggests in its brief, this was a very unusual investigation because Ms. Whitaker herself filed the report on this incident. She basically reported herself because she was concerned about what happened, and the same day that she did that, the store manager spoke to her for five to ten minutes, just asking about the situation. Ms. Whitaker would have had no reason to know at the time that she was under investigation, so it was not an investigatory interview. They never followed up with her to get a further written statement, as they did with other employees. They never contacted her again, and they never tried to figure out what was even going on and what the serious incident was that she had. So I think that's a clear departure from Starbucks' own written policies, and again without explanation, and so obviously I support all four of the board's rationales, but I think those two are the strongest on this record. I think your time is up. All right. Thank you. I'm interested in your analysis of Thrive that speaks to it as if it's an unusual and not previously repeated use of damages, and I'm thinking of Lew's Transport, which is a 2019 Sixth Circuit case that says interim employment expenses have been factored into back pay awards for more than 80 years. So why do you think that doesn't state this circuit's position? I'm glad you brought up Lew's Transport, because I think that is important. It's a compliance proceeding where the court is asking, did the board's back pay order correctly calculate back pay? The only issues in that case are things like, were the interim work expenses correctly calculated in their own rate, or should they have been subtracted relative to the interim earnings? So I think that case is a very good example of how in compliance proceedings people may challenge various aspects of back pay, and again, we have no quibble with back pay. The Supreme Court said it is a… That's not what Lew says. Lew says, we said, that interim employment expenses, not just back pay. Respectfully, Judge Strange, the way the board itself has conceived of those expenses and the way historically that's worked is as an incident of back pay, and that's what the order was also reviewing. And so again… If it's part of award of back pay or if it's part of the direct and pecuniary damages that someone suffers for an unfair labor practice, then why doesn't that cover exactly what we're talking about here? It is a fair argument you make that Thrive is different in context now because the board actually said, this is what we will do all the time going forward. And that is different. But what they are doing is not different. So respectfully, two answers on why what they're doing is different. One is they're not just classifying things that are traditionally considered back pay. Again, you can have a separate debate, what is back pay? We're not quarreling with the idea of back pay as restitutionary. That's what the Supreme Court has said in Title VII and Supreme Court stuff. What's going on in Thrive… I would caution the Title VII example because I think it is inept. I think it's just inept. Setting that aside, you still have the Russell Supreme Court decision that is about the NLRA itself and disavowing the idea that it authorizes compensatory damages. But the other thing about Thrive that I think is really important is it lists as exemplars and says, you must in compliance proceedings, all direct and foreseeable losses, consider whether those things include child care expenses, mortgage payments, all sorts of things. There's a laundry list of things the board has never, no point, never, ever awarded before. The dissenters note that. So it's an entire new category of things. No one can debate that they are part of back pay or historically have been understood as part of back pay. And the reason why we need to challenge that here is because if we don't challenge the categorical nature of that remedy at this point, all we could challenge in compliance proceedings is the amount of the award. And so it's like a Seventh Amendment violation or anything else. If you think that the board is doing an unlawful proceeding, which is what we think the compliance proceedings would be if they're trying to impose remedies that are beyond the board's power, the time to challenge that is now. I guess my question is, why wasn't the time to challenge it earlier before the board when you failed to raise those issues? We strenuously disagree that we failed to raise the issues. I urge you guys to read Supplemental Appendix 31 to 35. The board's pointed to it too. The thing that's definitely not in dispute is that the Thrive issue was absolutely raised by Starbucks before the board. Thank you. Thank you. We appreciate your briefing and your argument. The case will be taken under advisement and an opinion offered in due course.